May it please the court, Demetric Burns on behalf of Mr. Alston. This case comes before this court concerning Mr. Alston who pled and was sentenced and thereafter filed a 2255 motion alleging, among other claims, ineffective assistance of counsel. There was a report and recommendation by the magistrate which was adopted by the judge in the case denying his 2255 motion. A certificate of appealability was applied for at district court which was denied and thereafter a certificate of appealability was applied for in this court which was granted which described the issue as follows, Alston argues that he was denied effective assistance of counsel when his trial counsel significantly miscalculated the sentencing guidelines range based upon the belief that he would be sentenced based on a mixture of methamphetamine rather than actual methamphetamine and thereby denied Alston his right to trial. There are at least seven undisputed facts underlying this case before we get to what the court is addressing right here. The first and most important is that Alston and his attorney clearly believed he had pled guilty to a mixture of methamphetamine. This is important because the guidelines are different for a mixture of methamphetamine than they are for what's called actual methamphetamine. The fact that Alston and his attorney were mistaken about this is shown in the addendum to the PSR, it's shown in the discussion at sentencing, it's shown in the indictment and I believe the guilty plea too, the plea agreement, and the government even admits this in their brief at page 12. I think it's very important for me to spend just a moment talking about that indictment. It's an indictment covering an awful lot of defendants that starts out with count one with a, and that's in the record and in the excerpts, count one talks about the conspiracy charge and then they go on to A1, where A is the quantity of methamphetamine involved in the conspiracy. Number one, with respect to defendants Page, and I'm going to skip a few words, Boyd, Lucius and Page, they specifically talk about that the conspiracy involved 50 grams or more of a detectable amount of methamphetamine. But then paragraph two, they talk about with respect to defendant Larry Moore Alston and several other defendants, their conduct as members of the narcotics conspiracy charged in count one, which includes the reasonably foreseeable conduct of the other members of the narcotics conspiracy charged in count one involved a mixture and substance containing a detectable amount of methamphetamine, a schedule two controlled substance in violation of title 21 and so on. So certainly the indictment was convicted with the ability to say actual amphetamine and they say that for some of the other defendants, but for Larry Alston and a handful of them, all they talk about is a mixture or a substance containing a detectable amount. So that's one undisputed fact right there. And in fact, in the review and recommendation, which is the basis for what we're here for, the facts given by the magistrate in the report and recommendation, and that's in my brief at page 10, the original brief, according to his objection at the pre-sentence report and the discussion at Alston's sentencing hearing, Alston and his attorney clearly believed he had pled guilty to a mixture of methamphetamine and not to methamphetamine actual. Alston's attorney apparently advised him the sentence he was likely to receive for a mixture containing methamphetamine. The lab report showing the drug purity level as methamphetamine actual resulted in an increase in Alston's sentencing guideline range. So I'm belaboring that point because I don't want the argument to go back to something way before what this court is facing. Alston and his attorney were working under the misapprehension that it was a mixture and not actual methamphetamine. I mentioned there's several facts that are undisputed. The next one is that there's a lab report which showed up later on showing that the methamphetamine actually was of high purity. They did a handful of tests and almost all of them were in the 90 percentile region. Another fact is that that lab report was not provided to the defendant through discovery. That's not what we're arguing about here that we didn't, that Mr. Alston didn't get that lab in time, but it is part of the background of how we got to here. The PSR used that lab report in the high purity to calculate the guidelines. The defendant objected contemporaneously and in writing to the PSR, an addendum was filed maintaining the use of the guidelines with the actual methamphetamine. The district court, I'm sorry, the defendant objected both at the PSR stage and at the end of this. It's fairly clear and that is why the report and recommendation was very easily able to say this is the underlying fact right here. The defendant, I'm sorry, the district court denied the defendant's objection and in fact the case was appealed when it originally came through and this court held that no, the actual methamphetamine is the guidelines that should have been used. That's all the background to the 2255 motion filed on behalf of Alston alleging ineffective assistance of counsel. Ineffective assistance of counsel comes under the Strickland rule which we're all familiar with which has two prongs which said quickly is did the attorney err and did it affect the client. In the context of a guilty plea, you have to show that the attorney actually erred and again looking at the facts as presented in the report and recommendation and the facts in the case itself, the defendant did in fact err. When you're trying to determine if the attorney erred, the test is was his actions within the range of competence demanded of attorneys in a criminal case. Now the government's brief spends a lot of time focusing on a case where maybe it's not one pound but two pounds, maybe it's not one ounce but two ounces. In other words, the amount that certainly affects guidelines, the amount of drugs involved and often there are mistakes in the amount of drugs involved but this isn't just a question of one or two levels up or down. This is a question where the attorney picked the wrong guidelines to talk with his client about. It's like advising the client that you're going to be under these heroin guidelines as opposed to LSD. Not that you're going to be at one ounce or 1.2 ounces or three ounces. It's akin to advising the client on theft guidelines as opposed to terrorism. It's just the wrong guidelines that got told to the client and that is how it is different from cases that involve the attorney underestimating the amount involved in the case. In fact . . . I'm not sure what the timeline was but typically, you correct me, from the time that he pled guilty, his client is advised, I mean the attorney is advising him, in the period where the pre-sentence is prepared, sentencing may occur way down the road, right? Yes, sir. Presumably when the attorney is talking to the client, it's based on facts known then during the entry of the plea. So it's not until the pre-sentence is prepared, you know, months later or whatever, when we get to sentence. So now, as in this case, I presumed and that's where mixture or whatever, you know, occurs. So I guess my question to you is, you know, what's the attorney do? Wait until the pre-sentence. You know, the way the system works, he's not going to know until the pre-sentence for sure. So . . . Your Honor has put your finger on an issue that I don't think this case is ripe to face but it's always been a problem that I've had. A defendant stands there at the plea and the judges do their job and they say, I can't tell you what kind of sentence you're going to get because a pre-sentence report hasn't been offered. I know your maximum is this but I certainly can't tell you and I've heard this and I've read this in transcripts. The judge will say, the prosecutor can't tell you how much time you're facing or, I'm sorry, which guidelines will apply because the pre-sentence report hasn't been done. But so very often you'll hear the judge say, but you have, of course, discussed the applications of the guidelines with your client, with your attorney. They'll get the client to say that very often on the record. That's a problem and I don't think this is the exact case to face that issue where he's, if you were buying a car, you don't go to the car lot and say, I agreed to buy a car and I will come back tomorrow and decide how much I owe you and which car it is. But the statutory maximum was not involved here, right? I don't believe the statutory maximum was wrong. That is, in fact, I believe part of what the Eighth Circuit case cited in the report and it talks about the two issues in there. One was they held that the court's duty is to advise the defendant of the statutory maximum. That's not the issue in our case here, the court did that, okay? Our issue here concerns what type of advice the attorney has given to the client, whether that's effective . . . . . . I'm sure you've been there. What precisely is the error that you put your finger on that defense counsel's, you know, kind of in the horns of a dilemma in terms of engaging the client so we're strickling, we got to have error, we got to have the prejudice. So, how would you articulate what a strickling error here is given how this all plays out? Okay. And again, the problem in this particular case, which again was recognized by the report and recommendation, isn't that the attorney just said, oh, I'm off by ten percent or twenty percent or fifty percent of the amount of time you're facing. It was almost double. And in fact, the guideline range put him up near the maximum sentence. You've got a defendant who's trying to make a decision. Do I want to do a plea or do I want to demand my right to have a trial? Now, if the plea offered to him is going to give . . . have him facing practically the maximum anyway, then more often than not that criminal defendant's going to say, let's have a trial. What's to lose? Maybe the prosecution may fail on some parts of it and I maybe get a better outcome. But the error here isn't, and I am trying to answer your question, the error isn't that he just missed a little up and down on it. He picked the wrong guidelines, the completely wrong guidelines. Now, again, that was based in part on him not receiving that report until after the plea had been done, but that's not the crux of our error here. The crux is that he picked the wrong guidelines. If he had been advising him, let's look at the guidelines book and let's look under heroin, that would have been wrong. If he said, let's look at the guidelines, let's look under terrorism, that would have been wrong. That would fall outside of the range of competence demanded of attorneys in criminal cases. What should he have done without the report that he didn't do? What should he have done without the report that he didn't do? You said he didn't have the report. He certainly could have, before the plea, asked for additional material from the government, made discovery requests specific to that, but I believe that, again, he was operating based upon that indictment, which said a substance or a mixture. It was based on the plea agreement. It was based on everything before him, but he didn't do his job. He didn't find out that his client was going to be sentenced based on actual methamphetamine. Are you saying, I'm putting it this way because I know you're experienced with this, but I'm saying, you're saying that if the indictment alleges a substance and uses the word mixture, that that's a red flag that should go off to the lawyer, I mean, is that what you're saying? I get you about quantities, I hear you, but I'm saying as you're framing it, I mean, it's the question is asked. That's why I said, well, what is the error? If the indictment is framed, X pounds of whatever, whatever, that's different, but it's here. If it says, or mixture, is the mixture the red flag that the attorney shouldn't advise his client to enter the plea of guilty, you know you're not going to get a pre-sentence in advance of entering the plea. I'm just trying to play it out of my mind in real time because you do this all the time. What exactly do we articulate the error? We know the consequences in terms of the sentence, but when you get back to the point where you're advising the client to enter the plea facing the max and like that in the space that you've been in, do you see mixture and say, oh no, if it's got mixture, we can't do this, we roll the dice, we go to trial because we don't know what this is, he's convicted at trial, so then he gets more, so then he files ineffective counsel and says, well, I wanted to plead guilty, but my lawyer said, because the mixture was there, we should have . . . you follow what I'm saying? I'm not trying to be facetious at all. I'm just trying to, you know, putting the attorney in the space to say, okay, on this Strickland, we've got to have the error and we've got the prejudice, so given the way this plays out, sentencing doesn't occur the next day, it's there, how do we articulate what the error in this case is? Do we articulate it based on what we know happened or do we articulate, you know, something else? And that's a very good question. I've asked myself, five years ago, it might not have been a red flag. I see it now, this is a problem, that's a red flag, you're right, I'm going to stop and say, this says mixture, is that what we're dealing with? Now, my time's out, but . . . What do you do? You see the flag, so what does competent counsel do? A competent counsel would get some assurance that this, we're working under the apprehension of an indictment and a set of, a plea package that talks about mixture that, and we're not framing this in terms of pointing fingers at the government, although that report was a type of assurance, and in fact, the government, I think, even said in their brief that, well, we never had a stipulation in there that it would be mixture, perhaps that attorney should have said that, should have gotten that stipulation in writing. The plea agreement says mixture, but it doesn't say, we stipulate that we will use the guidelines for mixture. Perhaps that is what he should have done, especially because it so greatly increased the exposure of the defendant. Okay. We used to have a rebuttal time, but I mean, we hear your argument, we know it, and that's why it's up, you know, for argument to see, as you said, Restriction got identified error. In this case, we identified error based on what we know happened later versus, you know, is the attorney going to say, well, Your Honor, we can't enter a plea here unless we know. We're saying the lawyer should propound some discovery to the government, well, you know, we can't enter the plea until you do this, and so that's all we're teasing out, not trying to push you in a corner, but we're just trying to think through how we're going to . . . assume we say it's error and it's 22 to 55, what's the lawyer to do? We know here, you know, Judge Drell is very careful with, you know, his colloquy, and, you know, he lays it out, maybe more exacting than a lot of judges in terms of the whole schmeal, you know that better than I do, so from the standpoint of the sentence and the max, I mean, it's covered, so this all kind of comes back to what you're urging, the error on the part of the lawyer, right? So, anyway, you've still got your rebuttal time, we just were trying, you know . . . Thank you, Your Honor. May it please the Court, Your Honors, I'm Christina Walker with the United States Attorney's Office. We'd first point out that the strickling prong in this situation where a defendant is claiming that his attorney was ineffective in calculating the guidelines on the basis of the mixture of meth rather than actual methamphetamine is more carefully delineated in Hill v. Lockhart. You look at whether the actions of the attorney were reasonable, not necessarily erroneous because no attorney is perfect, you look at whether the actions were reasonable, and then in the prejudice prong, which is sort of a twist on strickling, you look at not just if the outcome would have been different, not just at whether or not his sentence was different, but rather if he had been advised differently by the attorney, would he have pleaded guilty and not . . . and insisted on trial. And in Lee, the Supreme Court even looked at that a little more closely at this prejudice prong and said that you don't look at post hoc assertions, you don't look at what happens after he's sentenced, you have to look at what was going on at the time of the guilty plea, and also you have to look at the contemporaneous evidence at the time of the guilty plea. So looking first at the reasonableness prong, we would point out the case of Valdez that was decided basically the same month that the report and recommendation was issued, which is maybe a reason why it wasn't mentioned in the report and recommendation out of the Fifth Circuit. And this case said that basically if a counsel underestimates a guideline range, that's not necessarily an unreasonable action. There in Valdez, there was an enhancement, there was a cross reference. You know, our position is that that's no different than getting . . . the actual and . . . the difference between actual and the mixture. It's a change in the guideline range. It's a miscalculation of how much your range is going to be. That's . . . it's comparable. And the important thing in our case that shows that the attorney is not . . . was not unreasonable was even though he pled to the mixture of the defendant's conviction, when a defendant pleads guilty to an offense involving a mixture or substance containing methamphetamine, the offense level is determined by the weight of the pure methamphetamine in the mixture or substance. If doing so would result in a higher offense. And this is in USSG 2D 1.1C, the commentary note B, and also in the Molina case. So contrary to what the defendant asserts, methamphetamine and the actual meth . . . it's the same drug. Even if when you look at the page where they delineate the ranges, like you have a dot for cocaine, you have a dot for heroin, then you have a dot for methamphetamine, mixture, actual, and ice. Well, it's three. So it's the same drug. It's the purity that's different, but it's the same drug. He wasn't using a guideline that was completely different like heroin and cocaine. It was the same . . . underneath the same dot. And as the Molina case shows and the commentary shows, they're the same drug. And when you plead to a mixture, if the weight . . . if it's so pure, you go by the weight of the purity. So that's our position in terms of the argument that it's not the same drug. I mean, it is basically the same drug. It's not. And it's the same guideline. It's under the same section. So it is comparable to those cases like Valdez where there was a miscalculation. Then in Valdez, this court indicated that the attorney's actions were reasonable because prior to his guilty plea, the defendant was informed by the attorney of the maximum penalty. Here, the attorney told the defendant about the maximum penalty. You see in the guilty plea colloquy that Judge Drell asks the defendant, did you discuss the plea agreement in maximum penalty form with your attorney? He said, yes. That encompasses the maximum penalty. And the judge also asked him if he understood that ultimately the judge would be the one that would determine the sentence and would determine the quantity. So as in Valdez, the attorney's actions were not unreasonable. Then the other indication that his actions were not unreasonable is if you look at the different calculations for mass versus actual, at sentencing, the attorney had argued that the defendant should be held liable for 297, well, really 3.197 kilograms of meth, not actual. And that's 325, which is 188 to 235. So that guideline range which the defendant's attorney argued for at sentencing, the 225 that he got falls within that guideline range. So it wasn't that unreasonable. He wasn't that far off when at sentencing he was arguing for the 3.197 meth versus actual. It was still within the . . . Now, the defendant claims in his 2255 that he was told that it would drop from 35 to 27.5, then 120 to 150, but there's no indication in the record besides his assertion that that's what the attorney told him and then that's contradicted by what the attorney argued at sentencing where he was arguing for 3.197, which was what a co-defendant, Lucius, Mr. Lucius, there had been some testimony that he was responsible for 1.5 kilograms to 5 kilograms of meth, Lucius was, and that's basically what the attorney argued for at sentencing. And again, if you look at the chart, it's 325, 188 to 235. Then going to the . . . And we just point some interesting language in Valdez that says that it's inconceivable that a Sixth Amendment violation occurs when counsel performs with anything less than mathematical precision in navigating a manual that routinely generates reversible plain error in our court. So, as I said, it's not perfect. It's whether his actions were reasonable. Then, looking at the prejudice prong, Valdez delineates, and so do some other cases like Batumula, the four criteria that one looks at in determining prejudice. One is the likelihood of success at trial, the risks of proceeding to trial, any indications that the defendant wanted to retract his guilty plea, and admonishments by the court. And again, we stress that you have to look at what's going on at the time of the guilty plea, not after when the defendant is not happy with his sentence. Now, in terms of the likelihood of success at trial, the PSI indicates, and some of the testimony during the guilty plea indicates, that there was substantial evidence of Mr. Alston's guilt. There were telephone conversations that were monitored. Other co-defendants could have testified against him. There was a conversation that established that the defendant was using his house as a stash house. He probably would not have testified because of his criminal background. Then, the risks of going to trial. What's interesting is that by pleading guilty, he would have gotten three points reduction for acceptance of responsibility if he had not I think he was communicating with a co-defendant in jail. He did certain things in jail that made him lose those three points. So, one of the risks of proceeding to trial was to lose those three points. If he had not lost those three points, and he had been sentenced on the basis of the actual math, his guideline would have been 168 through 210. So, it's really important to consider that. That it was his losing his acceptance of responsibility that really affected his sentence more than the actual versus mixture of math. The other thing, the risk of going to trial was, I mentioned this in my brief, the court made a miscalculation when it took five, it took two points. Criminal law offense, it was lowered from six to five because there was an assertion that he had been on parole when he committed the incident offense, and he claimed that he wasn't, so that was taken away. Well, the court miscalculated and came up with reduced two points of the base offense level, so it was 30 to five, which ended up being 210 to 240 because the mandatory maximum is 240. So, that was to his advantage because the correct calculation was 34 offense level, five criminal history category, which would have been 235 to 240, so he would have, if he had gone to trial, obviously that error would not have occurred. Then, the other risk of going to trial was the issue I mentioned about the criminal history category. At trial, there may have been evidence that, in fact, he was involved in the conspiracy when he was in parole, and that would have affected his criminal history category, and it could have been higher. Then, any of the representations about his desire to retract his plea, there was no motion to withdraw the plea at all. He mentions it in his 2255, but he never attempted to retract his guilty plea. The most important consideration are the admonishments by the court. That's the fourth thing you look at, and Mr. Alston was, excuse me, question, do you understand any recommendation by the attorney is not binding on the court, and you could receive a sentence higher than recommended by the attorney? The sentence is entirely up to me. Alston said he understood the guidelines that were affected by the quantity of drugs involved. He said he understood that the 20 years was the max. He said that no promises had been made. He said that there had been no agreement or stipulation about an agreed sentence. There are other cases where, an interesting case that is not published out of the Fifth Circuit is the Guzman case, where the defendant was sentenced to 480 months, but claimed his attorney had told him that he would be facing seven to 15 years imprisonment. The court didn't address whether that was reasonable or not, but said there was no prejudice because the district court advised him numerous times that he would be facing five to 14 years imprisonment. But Tumala, which is a little different because that was more erroneous in advice regarding deportation, which is considered in the Fifth Circuit basically a, excuse me, efficient performance, there was no prejudice because the defendant did not show that going to trial would have given him a more favorable result. He did not show he would have succeeded at trial, and he never addressed the risks he would have faced at trial. He did not move to withdraw his guilty plea, and the judge told him that he would be deported. In Lee, which is one of the cases where prejudice was found, there the defendant demonstrated reasonable probability that he would not have pleaded guilty if he had known about mandatory deportation. In Lee, the defendant throughout the case said, I don't want to be deported, I don't want to be deported, I don't want to be deported. He was willing to take the chance of . . . if he pled guilty, he would definitely be deported. If he went to trial, there's a possibility that he could be acquitted and not be deported, and the record was replete with references to the defendant's concern with deportation, and we don't have that here. Our record does not establish that. Also, in the reply brief, the Senate had indicated that a remedy would be to have the defendant re-sentenced in the plea agreement. That's not an appropriate remedy in an ineffective assistance of counsel claim. The appropriate remedy would be a vacating of the guilty plea, but we just pointed that out, that really re-sentencing at this point is not the appropriate remedy. I think, unless Your Honors have any questions, I don't . . . I don't think I have any more points to make. Thank you, Counselor. Thank you, Your Honors. The government's attorney did a fairly thorough job of following through in her brief, and I did file a reply brief, which I would, again, reiterate arguments made in that reply brief. Right now, I really only want to stress three things. One is, any argument by the government that, well, this is really the same drug, if the government's argument is, well, they're all the same thing, then why are they so insistent upon . . . but we want to use the one that imposes a stiffer penalty, so again, I made probably a facetious comment about the government wanting to have their cake and eat it, too, in the reply brief, but I think it really goes to the point of, is there a difference? There really is a difference. The attorney at the time was telling Mr. Austin, it's going to be this lower one that you're looking at. There is a difference. There was a difference. There ended up being a difference. The government also very correctly pointed out that the trial judge did a very good job of telling Mr. Austin that, you know, the quantity can affect it, the quantity can affect it, the quantity can affect it, but not a word about the quality because that, again, is an order of magnitude. It's not just a few percent more, a ten percent more, a twenty percent more. It's almost a doubling of what he was facing. Then the last point I want to make is, this court is going to issue a ruling and it may be favorable or unfavorable to Mr. Austin, but in that ruling more than likely there's going to be some guidance to the courts about how we handle these kind of cases when someone's claiming there's ineffective assistance of counsel. What do you say about Valdez? I mean, counsel mentioned Valdez. A similar argument was made, you know, before a panel's a split decision, but basically that was about a misunderstanding about a section of the guidelines. It's not mixture as you have here, but still the panel held what it held. So, what's your response to Valdez, you know, which was issued, I guess, during the briefing of this or somewhere in the process? And my argument as I understand it with Valdez is that another enhancement was applied, or there was a question, was that the one about deportation? Something other than the basic underlying, this is the offense and these are the guidelines that apply and this is the amount of exposure you have. It was an addition to it, if I'm remembering Valdez. Oh, well, Valdez, you know, the argument was made similarly of, you know, ineffective assistance of counsel because the lawyer misapprehended, you know, what was the calculation, didn't get it exactly right. It's not identical as far as the mixture, but it's right up there as far as this kind of, you know, argument and the panel rejected that and, you know, based on all the usual principles. So, the question is whether the holding in Valdez sort of controls, you know, what we do. We can't overrule, you know, what another panel has put out there, but that's not the immigration, I mean, that's the government, I mean, it's right there. And that's what I was getting to is this court is going to make a rule and they're going to put it in their opinion for guidance for the lower courts and that rule can be anywhere from, well . . . Well, but what I'm saying is we may say see Valdez. I guess that's what I'm saying to you. We might say see Valdez. So, we may or may not do what you just said. I'm just saying, assuming arguendo that Valdez is a recent case in the court that addresses the scenario of arguably ineffective counsel misapprehending something, da-da-da-da-da, but that, you know, the panel holds. No. You know, given the advice by the court, et cetera, et cetera, et cetera, no reversible error. I'm just saying the case is there, in addition to the fact that the argument that you're making about the sentence already came up here and a panel affirmed the sentence about the mixture or not, and, you know, so that appeal only in itself, the panel rejected the argument about the discrepancy. So, I guess my question is, given that one panel has already rejected on the direct appeal, the argument about the sentencing and the mixed discrepancy, and then number two, you know, we've got a case dealing with this ineffective assistance case, what's . . . how do you distinguish? Okay. Again, I believe, I hope articulately enough in my reply brief, but that Valdez . . . I'm sorry, this case started with the wrong guidelines. I'm sorry, that this case started with the wrong guidelines, an advice concerning mixture as opposed to advice concerning actual. So again, it got off on the wrong foot entirely from the advice from the attorney, and you're right, this court may hand down a ruling that just says, the trial judge told him the maximum, that's all that we need to worry about. I would hope this court doesn't do that. Well, let me explore that a minute. I've never been in the criminal side of the practice. I assume they test the substance at some point to make sure, before there's an indictment, to make sure it's really what it is before you're charged. Is that correct? I believe that's the general practice. When do they make the purity determination? I don't know exactly when the purity determination was, but in this particular case, the test that gave the purity determination was not given to Mr. Allison's attorney during discovery. I'm just saying, was it available at the time of indictment? Was the test available at the time of indictment? I don't know the answer to that. I would expect that it was, but I do not know the answer to that. If counsel asked for it, it wasn't given to them, that's a different problem than ineffective, isn't it? Okay, but you're asking about indictment, and I think the focus actually is more on the plea. Well, but you get the plea at the same time . . . I'm sorry. You get the indictment, and if there's a report available from the government at the time of indictment that shows purity, it seems to me counsel would ask for that, so you could know more clearly, what are we looking at here? In this case, that report was not provided. I believe the government conceded that point. It was not provided. Was it requested? I don't know the answer to that. To me, that makes a difference, because it would seem that competent counsel would ask for discovery right as soon as the indictment issues. Let me see the report on purity, so we'll know what we're talking about here. If the government doesn't give it, then that's a different problem. You ask what could counsel do, and it seems to me counsel should ask as soon as the indictment's handed down for a report on the purity of the drug. I know what I would do going forward, although this is 20-20 hindsight. That is, if I have a client who has an indictment and has the word mixture, then I would have that as part of the government, and the defendant stipulates that the guidelines will be used for the mixture as opposed to the actual methamphetamine. Like I said, I think this case has taught me something, but I believe the government admits that this report was not given at the time of the plea, which is the important part, because that's where all of a sudden he might say, oh, no, I'm facing that much, maybe I shouldn't plead, maybe I should go to trial. But there's no allegation that counsel asked for it and it didn't get it? I don't know the answer to that. Okay. All right. Thank you. Thank you, counsel. That will conclude the arguments for this morning. This court will stand in recess until 9 o'clock in the morning. Thank you.